**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In re:                                    )
                                          )
MEGAN SKUBAL,                             )        Chapter 7
                                          )        Case No. 13-14627-BFK
                        Debtor.           )

**MEMORANDUM OPINION**
**AND ORDER SUSTAINING IN PART**
**AND OVERRULING IN PART OBJECTIONS TO**
**TRUSTEE'S FINAL REPORT ON REMAND**

This matter is before the Court on remand from the District Court. Although the District

Court affirmed this Court's decision approving the Chapter 7 Trustee's Final Report and Final

Application for the Allowance of Fees and Expenses, and affirmed this Court's decision to

overrule Mr. Skubal's Motion for Reconsideration of the same, the District Court remanded the

case to this Court for further findings on "whether the benefit to be derived from the Trustee's

decision to file and pursue claims on behalf of creditors who did not file claims was outweighed

by the harm imposed on the parties in interest, including the debtor and Mr. Skubal." *Skubal v.*

*McCarthy,* Civil No. 1:17-cv-936 (AJT/TCB), Docket No. 10, p. 13.

The Court heard the evidence and the arguments of the parties on September 21 and 28,

and November 7, 2018. For the reasons stated below, the Court will disallow the legal fees

incurred by the Trustee in defense of the Midland claim, but will allow the fees incurred in

defense of the Debtor's non-dischargeable student loan claims. Accordingly, the Debtor's and

1

Mr. Skubal's Objections to the Trustee's Final Report will be sustained in part and overruled in part.

**Findings of Fact**

The Court, having heard the evidence, makes the following findings of fact:

*A.   Ms. Skubal Files a Voluntary Petition in Bankruptcy.*

1.      Megan Skubal ("Ms. Skubal," or "the Debtor") is an attorney licensed to practice in the State of North Carolina. She has an M.B.A. from the University of Central Florida and a J.D. from New York Law School. She is now employed with the U.S. Patent and Trademark Office.[1]

2.      Ms. Skubal's father, Thomas Skubal, resides in Boca Raton, Florida. He is a real estate developer. He also has had experience as an examiner with the Federal Home Loan Bank Board.

3.      Before Ms. Skubal filed for bankruptcy relief, her father put her on the title to a number of his properties, as an estate planning device. Ms. Skubal did not contribute to the purchase prices, nor to the maintenance, of any of these properties.

4.      Ms. Skubal also agreed to act as personal guarantor for an acquisition loan and a line of credit, both from SunTrust Bank, on one of her father's properties. The loan went into

---

[1] Ms. Skubal has since changed her last name to Carlson. The Court will refer to her as Ms. Skubal in this Opinion to avoid confusion with the prior docket entries and transcripts in this case and with Judge Trenga's Order remanding the case to this Court.

default and SunTrust filed a lawsuit against her to collect on the line of credit. TR. Ex. 1.[2] It was

this event that caused her to file for bankruptcy relief.

      5.      On October 11, 2013, Ms. Skubal filed a Voluntary Petition under Chapter 7 with

this Court. Tr. Ex. 2.

      6.      Kevin McCarthy, a member of the U.S. Trustee's Panel of Chapter 7 Trustees in

this District, was appointed as the Chapter 7 Trustee.

      7.      In her Schedules, the Debtor listed an ownership interest in the following

properties:

| Property | Value | Secured Claims |
|---|---|---|
| • 226 Old Meg's Lane<br>  Boone, NC 28607 | $500,000.00 | $320,000.00 |
| • 306 Old Meg's Lane<br>  Boone, NC 28607 | $500,000.00 | $850,000.00 |
| • 5701 Camino Del Sol #306<br>  Boca Raton, FL | $140,000.00 | $175,000.00 |
| • Firethorn Lot #102<br>  Blowing Rock, NC 28605 | $150,000.00 | $0.00 |

*Id.,* Schedule A.

      8.      For the 226 Old Meg's Lane property and the 306 Old Meg's Lane property, the

Debtor listed the properties as: "titled jointly with father. Debtor invested $0 in the property." *Id*.

---

[2] For purposes of this Opinion, the Trustee's Exhibits will be referred to as "TR. Ex. __." The Skubals' Exhibits
will be referred to as "Skubal Ex. __."

9.      For the 5701 Camino Del Sol #306 property, the Debtor listed this as: "owned jointly with father." *Id*.

10.      The Debtor listed the Firethorn Lot #102 property as: "Debtor invested $0; no debt."

11.      All four of the properties were listed as being owned jointly as tenants in common with the Debtor's father, Thomas Skubal.

12.      The Debtor also listed an ownership interest in an entity known as Dawn to Dusk, Inc., dba "Get Smart Preschool, S Corp. located in Florida," with a value listed as "Unknown." *Id*., Schedule B.

13.      On the debt side, she listed the following secured debts:

| Creditor | Collateral | Amount of Claim |
| --- | --- | --- |
| SunTrust Bank | 306 Old Meg's Lane | $100,000.00 |
| SunTrust Mortgage | 226 Old Meg's Lane | $320,000.00 |
| SunTrust Mortgage | 306 Old Meg's Lane | $750,000.00 |
| TD Bank | 5701 Camino Del Sol #306 | $175,000.00 |

*Id*., Schedule D.

14.      She further listed the following in unsecured, non-priority debts:

| Creditor | Amount of Claim |
| --- | --- |
| ACS Education Services | $46,171.47 |
| Bank of America | $1,002.58 |
| Citi Platinum Card | $25,818.06 |

4

| Verizon | $200.00 |
| Verizon Wireless | $419.41 |

*Id*., Schedule F.

15.    The Debtor listed each of the unsecured, non-priority claims as "not contingent, not unliquidated and not disputed." *Id.*

16.    The Trustee conducted a meeting of creditors on November 13, 2013. At the meeting of creditors, the Trustee learned that the Get Smart Preschool was an operating day care center in Florida with 20 to 25 employees.

17.    The Debtor advised the Trustee that 206 Meg's Lane was a vacation home in North Carolina that her father used a few weeks per year.

18.    The Trustee also learned that the property at 5701 Camino Del Sol #306 was Mr. Skubal's residence.

19.    The Trustee further learned that Ms. Skubal was on the title to these properties as an estate planning tool, used by her father to avoid probate distribution.

20.    Although the Debtor filed the case as a "no asset" case (that is, she checked the box on the petition that stated "Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors"), the Trustee requested an Asset Notice and a bar date for the filing of claims. Docket Nos. 13 and 14.

21.    In response, the Clerk sent out a Notice to all of the creditors listed in the Schedules of a bar date to file claims of April 16, 2014. Docket No. 16.

22.     Wilmington Savings Fund Society, FSB filed a Motion for Relief from the

Automatic Stay with respect to the Debtor's interest in the property at 306 Old Meg's Lane,

which was granted without opposition. Docket Nos. 10 (Motion), 12 (Order).

23.     The Trustee filed an Application to employ his law firm, McCarthy & White, PC,

as his counsel in the case, which also was granted without opposition. Docket Nos. 19

(Application to Employ), 22 (Order).

   B.   *The Trustee Begins Exploring a Sale of Certain Assets.*

24.     In November 2013, the Trustee began exploring the value of certain assets by

requesting information from Ms. Skubal's counsel. Tr. Ex. 3.

25.     The Trustee called Mr. Skubal in January 2014 to discuss the properties. The

Trustee advised Mr. Skubal that he wanted to work with Mr. Skubal. Mr. Skubal advised the

Trustee that he had an attorney in North Carolina, though he did not identify the attorney. The

Trustee asked Mr. Skubal to have the attorney call him, but no attorney contacted the Trustee.

26.     The Trustee followed up with a call to Mr. Skubal in February, but Mr. Skubal did

not return the call.

27.     The Trustee recorded a certified copy of Ms. Skubal's bankruptcy petition in the

land records in North Carolina in order to prevent an unauthorized transfer of the properties

while the bankruptcy case was pending. Tr. Ex. 4.

28.     The Trustee viewed the unencumbered Lot (Lot 102) as being both the easiest to

sell and the least intrusive means to Mr. Skubal of paying the creditors.

6

*C.  The Trustee Explores Filing Proofs of Claim.*

29.     As of the bar date of April 16, 2014, only two unsecured proofs of claim were filed, both for Verizon, totaling $569.71. Claims Nos. 1-1, 2-1.

30.     SunTrust filed a secured proof of claim in the amount of $100,000.00 on May 21, 2014, after the bar date for filing claims. Claim No. 5-1. SunTrust never amended its claim to state a deficiency claim after it foreclosed on its collateral.

31.     On April 18, 2014, the Trustee wrote to the Debtor's counsel, encouraging him to file a Proof of Claim on behalf of Ms. Skubal's student loan lender, ACS Education Services ("ACS"). TR. Ex. 5.

32.     On May 8, 2014, the Trustee wrote to ACS and Citi Platinum Card ("Citi"), the credit card claimant, encouraging them to file claims. TR. Exs. 6, 9.

33.     At the same time, the Trustee began exploring the propriety of filing claims on behalf of the creditors, by making inquiries with the Office of the U.S. Trustee for this District, and by contacting other Chapter 7 Trustees in this District to solicit their views. TR Exs. 7, 8.

34.     The Trustee also conducted legal research on the propriety of filing claims on behalf of creditors. He concluded that the plain language of Bankruptcy Code Section 501(c) and Bankruptcy Rule 3004 entitled him to file proofs of claim, and that neither the plain language of the Code nor that of the Rule contained a "benefit to the debtor" requirement.

35.     On May 12, 2014, Ms. Skubal's counsel wrote to the Trustee and advised the Trustee that she had elected not to file a claim in her case. TR. Ex. 14.

7

36.     The Trustee contacted ACS before he filed a claim on its behalf. ACS advised

him that they do not normally file claims in bankruptcy cases; rather, they suspend any collection

activities. It was their policy not to get involved in bankruptcy cases.

   *D. The Trustee Files Two Proofs of Claim.*

37.     On May 15, 2014, the Trustee filed two unsecured proofs of claim. The first

claim, No. 3-1, was filed on behalf of ACS, in the amount of $46,171.47. The second claim, No.

4-1, was filed on behalf of Citi in the amount of $25,818.06.

38.     The Trustee requested that the Clerk provide the two claimants with notice that

claims had been filed on their behalves. TR Ex. 18. The Clerk did so on June 17, 2014. Docket

Nos. 25 and 26.

39.     Neither ACS nor Citi withdrew the claims filed on their behalves, after the Clerk

sent them notice of the filing of the claims.

   *E. The Trustee Files a Section 363(h) Complaint Against Mr. Skubal.*

40.     On June 24, 2014, the Trustee mailed a letter to Mr. Skubal. TR. Ex. 19. In his

letter, the Trustee advised Mr. Skubal that he did not plan on administering 306 Old Meg's Lane

(on which relief from the automatic stay had already been granted). He advised Mr. Skubal that

he planned to sell one or both of the other North Carolina properties. He further stated: "If

necessary, I could also attempt to sell the Florida day care business, but I assume it will be easier

to sell the real properties." *Id.*

41.     Having heard no response from Mr. Skubal, the Trustee filed a Complaint to sell

226 Old Meg's Lane and Firethorn Lot 102, on July 7, 2014. TR. Ex. 20. The Trustee did not

8

include the Boca Raton property (which, as noted, was Mr. Skubal's residence), nor did he seek

to sell Ms. Skubal's interest in the day care business in Florida.

42.     The Trustee mailed a copy of the Complaint to Mr. Skubal, along with a proposed

Consent Order. TR Ex. 21.

43.     Mr. Skubal engaged the services of Richard Hall as his attorney. On November

28, 2014, Mr. Hall wrote an e-mail to the Trustee in which Mr. Hall stated in part:

> Mr. Skubal proposes letting you sell the lot. There are three significant creditors in the
> case, Asset Acceptance, the student loan, and the administrative expenses. Mr. Skubal
> proposes that these [be] paid out of the proceeds from the sale of the lot, and that you
> have a right to invade his share to accomplish this.
>
> *Mr. Skubal does see some benefit in having his daughter's student loan debt repaid,* if it
> must be done, and the admin expenses are what you may be awarded, but he has objected
> to the claim of Asset Acceptance, and he will take the risk that the objection will be
> sustained, or not.

TR Ex. 22 (emphasis added).

44.     On February 5, 2015, the Court entered an Order Approving Compromise, with

both the Debtor's and Mr. Skubal's counsel's endorsements ("Seen and Agreed"). The Order

Approving Compromise provided in part:

> The Trustee and the Defendant agree that, subject to Court approval of any sales contract,
> the Trustee may sell the Properties under 11 U.S.C. § 363(h), but only in the following
> order and on the following terms and conditions:
>
>   a.   The Trustee will sell Firethorn Lot 102 first.  After selling Firethorn Lot 102,
>        he will sell 226 Old Meg's lane only if the sale proceeds from Firethorn Lot
>        102 are insufficient to pay allowed claims and allowed and estimated
>        allowable administrative expenses in full.
>
>   b.   Subject to subparagraph a above, the Trustee will retain a realtor subject to
>        Court approval to list and market the Properties;

   c.  Subject to subparagraph a above, the Trustee will determine a list price.

   d.  Subject to subparagraph a above, the Trustee will negotiate a sales contract, and any sales contract he enters into will be subject to notice to parties in interest and approval of the Bankruptcy Court. Thomas Skubal will be entitled to notice of the proposed sale and will have a right to object to it.

   e.  Subject to subparagraph a above, sale proceeds from the Properties will be administered as follows:  i) costs of sale including realtor commissions will be paid at closing; ii) any liens on the Properties will be paid in full; iii) the entire remaining amount from the sale of Firethorn Lot 102 will be retained by the Trustee for the benefit of the bankruptcy estate to the extent needed for the payment of allowed claims and allowed and estimated allowable administrative expenses in full; iv) the Trustee will distribute to Thomas Skubal any amount from the sale of Firethorn Lot 102 not needed for the payment of allowed claims and allowed and estimated allowable expenses in full; v) if the net sale proceeds from Firethorn Lot 102 are insufficient to pay allowed claims and allowed and estimated allowable administrative expenses and the Trustee sells 226 Old Meg's lane, he will retain only the amount that, combined with the net sale proceeds from Firethorn Lot 102, is needed for the payment of allowed claims and allowed and estimated allowable administrative expenses in full, and will distribute the remaining amount to Thomas Skubal.

Docket No. 53, ¶ 8.

45.    When asked in this proceeding whether he was benefitted by the terms of the Consent Order, Mr. Skubal testified: "Yes – I would much rather see the Lot go first."

*F.  The Objections to Claims.*

46.    On November 26, 2014, Mr. Skubal filed an Objection to the Citi Proof of Claim filed by the Trustee, which was now held by Midland Credit Management. Docket No. 32.

47.    Midland amended its claim a number of times. First, Midland amended its claim from the originally stated amount of $25,818.06 to the increased amount of $41,385.12. Claim

No. 4-2. After discussions with the Trustee, Midland amended its claim downward, to the amount of $25,962.59 – almost identical to the amount that the Debtor originally had stated under oath in her Schedules as being "undisputed," $25,818.06. This amended claim satisfied the Trustee's concerns as to the amount of the claim.[3]

48.     The Trustee filed a Response, requesting that Mr. Skubal's Objection be overruled. Docket No. 40.

49.     The U.S. Trustee filed an Objection to the Citi/Midland Proof of Claim and an Objection to the ACS student loan Proof of Claim. Docket Nos. 46, 47.[4]

50.     The Trustee responded to the U.S. Trustee's Objections, again asserting that both claims should be allowed. Docket No. 65.

51.     The Court held a hearing on the claims objections on April 7, 2015. At the conclusion of the hearing, the Court ruled:

- Mr. Skubal did have standing to object to the claims because he had a direct pecuniary interest owing to the Consent Order and his interest in the properties to be sold. Docket No. 74, Tr. (4/7/2015), pp. 50-51.

---

[3] Mr. Skubal reiterated his Objection after Midland amended its Proof of Claim, this time asserting that the claim was barred by the statute of limitations. Docket No. 58. The U.S. Trustee filed a Supplemental Objection to the Midland claim, adopting Mr. Skubal's argument that the claim was barred by the statute of limitations. Docket No. 60.

[4] Mr. Skubal did not object to the ACS student loan claim, concluding that the U.S. Trustee's Objection was sufficient.

- The Court sustained Mr. Skubal's and the U.S. Trustee's Objection to the Midland claim on the ground that the claim was barred by the applicable statute of limitations. *Id.*, pp. 51-55.

- With respect to the ACS student loan claim, the Court found that it did not need to rule on whether the Trustee needed to show a benefit to the Debtor in order to file claims under Code Section 501 and Bankruptcy Rule 3004. The Court found that "there's simply an obvious benefit to the debtor in paying the nondischargeable student loan, at this point, in full, as opposed to saddling the debtor with monthly payments for whatever the remaining term of the student loan debt may be." *Id.*, p. 56. The Court, therefore, overruled the U.S. Trustee's Objections to the ACS claim. *Id.*, p. 57.

52.     Orders were entered reflecting the Court's rulings on the claims objections – allowing the ACS claim, and disallowing the Midland claim. Docket Nos. 72, 73. Neither the U.S. Trustee nor Mr. Skubal appealed the Court's adverse ruling on the student loan claim. Mr. McCarthy did not appeal the Court's adverse ruling on the Midland claim.

53.     The Trustee incurred approximately $32,000.00 in reviewing, researching and responding to the Objections to the two claims. TR Ex. 51. Of this amount, $10,060.00 can be attributed to the Trustees' defense of the Midland claim, and $21,929.50 can be attributed to his defense of the ACS claim. *Id.*

54.     In defending the claims, the Trustee viewed it as his duty to pay claims that were not objectionable, noting that the Debtor had listed the claims as being undisputed in her

Schedules. At the same time, the Trustee was conscious that his law firm's fees would be increased by defending against the Objections to the claims.

55.    The Trustee also considered that there might be a statute of limitations objection to the Midland claim, but he assumed that Midland had a written contract. In the end, Midland was unable to produce a written agreement and the Court sustained the Objection to the claim on the ground that it was barred by Virginia's three-year statute of limitations for unwritten contracts.

*G. The Trustee Hires a Realtor for the Sale of Lot 102.*

56.    On March 13, 2015, the Trustee wrote to Mr. Skubal's counsel, seeking input on the selection of a realtor for Lot 102. TR Ex. 25. In his e-mail, the Trustee noted that Mr. Skubal had listed the lot for $275,000.00, which in the Trustee's view, after consulting with a realtor, was "wholly unrealistic." *Id.* The Trustee also requested that Mr. Skubal cancel his listing for Lot 102 with Hans Kohler, as this was inconsistent with the term of the Consent Order allowing the Trustee to choose the realtor. *Id.*

57.    Initially, the Trustee used Pat Taylor of Blowing Rock Realty to list Lot 102. Ms. Taylor recommended that the Lot be listed for $100,000.00. *See* Docket No. 67 (Order Granting Trustee's Application to Employ Real Estate Agent).

58.    On April 7, 2015, Mr. Skubal's counsel wrote to the Trustee and advised him that Mr. Skubal intended to pay off the student loan claim "by the end of the week." TR. Ex. 27, p. 2. As set forth below, Mr. Skubal did not pay off his daughter's student loans until a year and a half later on November 28, 2016. TR Ex. 43.

13

59.     The Trustee responded the next day, April 8, 2015. In his e-mail, the Trustee requested evidence that the student loan claim was paid. TR Ex. 27. The Trustee also requested Mr. Skubal's counsel to advise him if Mr. Skubal had any interest in purchasing Lot 102. *Id.* ("[L]et me know if he has any interest in buying it back himself for enough to pay the remaining claims and administrative expenses.")

60.     The Trustee spoke with Mr. Skubal's agent, Mr. Kohler about listing Lot 102. Mr. Kohler expressed that he was uncomfortable listing the lot, as his client was Mr. Skubal. Mr. Kohler advised the Trustee that he would list the lot for $150,000.00. TR Ex. 29. The Trustee was fine with that, as long as he had the ability to drop the price as time went by. *Id.*

61.     At Mr. Skubal's suggestion, the Trustee contacted a third realtor, Maurice Williams, at Village Realty (who had already been retained by Mr. Skubal). Mr. Williams was willing to list the lot, but only if he could reduce the price periodically. The Trustee advised Mr. Skubal's counsel of this in an e-mail dated May 8, 2015. TR. Ex. 32 ("We will start out the list price at 199,000 – the same list price that Mr. Skubal had authorized. However, we will drop it monthly [in] 10 or 20,000 increments as needed in order to be able to sell it during the prime May-November selling season.")

62.     The Trustee engaged Mr. Williams as his realtor for Lot 102 in May 2015. *See* Docket No. 79, Order Granting Trustee's Application to Employ Real Estate Agent.

63.     Mr. Williams also advised the Trustee that Mr. Skubal was getting ready to list the property at 226 Old Meg's Lane. TR Ex. 31. Mr. McCarthy then contacted counsel for Mr.

Skubal and requested him to cancel the listing for this property, as it was inconsistent with the terms of the Consent Order. TR Ex. 32.

64.     On May 12, 2015, Mr. Skubal's counsel wrote to the Trustee stating that Mr. Skubal was not happy that "the word was out among realtors that the Firethorn lot is being sold as part of a bankruptcy." TR. Ex. 33. Mr. Skubal further advised the Trustee that Mr. Skubal was "thinking" of paying off the student loan. *Id.*

65.     The MLS listing for Lot 102 stated in part as follows:

Lot 102 sale is being forced by McCarthy, Trustee for the Court. It is not a foreclosure, however, the sale is approved by McCarthy. The owner has the right to object to the sales price in which case the sale goes to the court appointed judge to be approved.

Skubal Ex. J.

66.     In the Trustee's view, the fact that the property was a part of a bankruptcy was required to be disclosed because all offers, even one accepted by the Trustee, were subject to higher and better offers (which is what came to pass in this case).

67.     The Trustee responded by saying it was "fine" if Mr. Skubal paid off the student loan – "However, if he is going to do that please have him do it very, very soon." *Id.* The Trustee also expressed some willingness to compromise on his fees. *Id.*

68.     On May 21, 2015, the Trustee wrote to counsel for Mr. Skubal and advised him that Mr. Skubal was listing the house (226 Old Meg's Lane) with yet another realtor. TR Ex. 35. The Trustee viewed this as being inconsistent with the terms of the Consent Order and requested that Mr. Skubal cancel the listing. *Id.*

15

69.     In January 2016, Mr. Skubal, the Debtor and her husband signed a Deed of Trust granting a mortgage lien against 226 Old Meg's Lane in the amount of $311,102.02, in favor of Johnson County Bank. TR Ex. 36. This Deed of Trust was not authorized by the Court. When it was recorded, the Trustee did not even know about it, much less consent to it.

70.      In September 2016, Mr. Williams, the realtor for Lot 102, wrote to Mr. McCarthy and advised him that Mr. Skubal was threatening to sue Mr. Williams, and that Mr. Skubal was unhappy that the price of the lot was being dropped. TR Ex. 38.

71.     The Trustee then communicated with Daniel Press, an attorney whom Mr. Skubal was considering retaining, and advised him that "Mr. Skubal can make sure neither property in North Carolina is sold for a price he finds unacceptable by paying the allowed claims and administrative expenses. I am willing to discount my legal fees to some extent to aid that effort." TR Ex. 39.

*H.  Mr. Skubal Pays Off the Student Loan Claim.*

72.     On November 14, 2016, the Trustee advised Mr. Skubal's counsel that "it looks like the price [for Lot 102] is going to be $45,000, which means I will have to sell the house too unless the student loan is paid off separately." TR Ex. 42.

73.     Two days later, on November 16, 2016, Mr. Skubal paid his daughter's student loans in full. TR Ex. 43. The payoffs for the three loans totaled $44,289.15. *Id*.

74.     When asked in this proceeding why he paid off his daughter's student loans, Mr. Skubal testified that he did this so the Trustee "would have nothing to settle with the creditors."

*I.   The Court Approves the Sale of Lot 102 to Mr. Skubal.*

75.     On November 18, 2016 (two days after Mr. Skubal paid off the student loan

claim), the Trustee filed a Motion for Approval of the sale of Lot 102 to a third-party purchaser

for $45,000.00. Docket No. 84.

76.     Mr. Skubal filed an Objection to the proposed sale. Docket No. 87. The Trustee

filed a Response. Docket No. 88.

77.     The Court held a hearing on the proposed sale on December 20, 2016. At the

hearing, Mr. Skubal took the stand and began to testify that the price obtained by the Trustee was

unreasonably low. At the end of his cross examination, the parties requested a short break, which

the Court granted. When Court resumed, the parties advised the Court that Mr. Skubal had

agreed to purchase Lot 102 for $46,000.00, with a closing to take place in 45 days. The

purchaser under the Trustee's original contract was not in court to bid against Mr. Skubal's bid,

so the Court approved the sale to Mr. Skubal on those terms. The Court entered a Consent Order

approving the sale to Mr. Skubal on December 22, 2016. Docket No. 90.

*J.   The Trustee's Final Report and Application for Compensation.*

78.     On May 17, 2017, the Trustee filed his Final Report and Application for

Compensation. Docket Nos. 94, 96. In his Application for Compensation the Trustee sought at

total of $34,500.00 in fees, which was reduced from a total of $57,500.00. Docket No. 96. The

Trustee also sought his statutory commission in the amount of $5,350.00. Docket No. 94.

79.    The Trustee proposed to pay the only remaining claims in the case (after the Court

sustained the Objections to the Midland claim and Mr. Skubal voluntarily paid off the student

loan claim) in the amount of $552.61. *Id.*

80.    Mr. Skubal filed an Objection to the Trustee's Application for Compensation.

Docket No. 98.[5]

81.    The Court held a hearing on the Application for Compensation on June 20, 2017.

The Court ruled first that Mr. Skubal, as a purchaser of property of the estate, lacked standing to

object to the fees. Docket No. 115, Tr. (6/20/2017), p. 8. The Court then overruled the Objection

on the merits. *Id.*, pp. 8-9.

82.    Mr. Skubal filed a Motion to Reconsider, this time joined by his daughter, the

Debtor. Docket No. 104. The Trustee filed a Reply Memorandum. Docket No. 106.

83.    The Court entered an Order denying the Motion to Reconsider on August 8, 2017.

Docket No. 108.

*K.  Mr. Skubal's Appeal and the Remand to this Court.*

84.    Mr. Skubal and the Debtor filed a Notice of Appeal of the Order Denying the

Motion to Reconsider (not of the Order approving the Trustee's Final Report and Application for

Compensation). Docket No. 110.

85.    On May 16, 2018, the District Court entered an Order affirming this Court's

decision on the Motion to Reconsider, but remanding the case to this Court for further findings

---

[5]  The U.S. Trustee did not object to the requested fees. Docket No. 115, Tr. (6/20/2017), p. 7. As well, the Debtor
did not file an Objection.

on "whether the benefit to be derived from the Trustee's decision to file and pursue claims on behalf of creditors who did not file claims was outweighed by the harm imposed on the parties in interest, including the debtor and Mr. Skubal." Docket No. 124, District Court Order, p. 13.

86.     The Court heard the evidence and the arguments of the parties on remand on September 21 and 28, and November 7, 2018.

*L. The Trustee's Testimony.*

87.     The Trustee testified that he sought the advice of the U.S. Trustee's Office, and the advice of the other individuals serving as Chapter 7 Trustees in this District, on whether or not he could file the claims.

88.     After researching the issue, the Trustee concluded that the plain language of Section 501(c) and Bankruptcy Rule 3004 did not contain a "benefit to the debtor" requirement, and did not prohibit him from filing the claims.

89.     In the Trustee's view, it was his duty as a fiduciary to pay claims that should be allowed and to object to claims for which there was a legal basis for an objection.

90.     The Trustee introduced, without objection, an Exhibit that summarized his time entries on the claim objections. TR Ex. 51. Overall, the Trustee incurred $41,989.50 in fees - $10,060.00 of which was allocable to defending the Midland claim, and $21,929.50 of which was allocable to defending the ACS student loan claim. *Id.,* p. 7.

91.     The Trustee perceived a benefit to Ms. Skubal in paying off her student loans, which otherwise would have been non-dischargeable.

92.     The Trustee acknowledged that there was some consideration of a profit motive on his behalf in deciding to file and pay the proofs of claim.

93.     He further testified that he negotiated with Midland to reduce its Amended Proof of Claim from a high of $41,385.12, to $25,962.59, an amount almost identical to the amount stated as being undisputed by the Debtor in her Schedules.

*M.  Ms. Tavenner's Expert Testimony.*

94.     Lynn Tavenner testified as an expert witness on behalf of the Trustee. Ms. Tavenner is a highly experienced Chapter 7 Trustee in this District. She was admitted to the Virginia State Bar in 1989. She has served as a Chapter 7 Trustee since 1997. She was qualified as an expert without objection.

95.     Ms. Tavenner testified that in her opinion the Trustee's primary duty is to pay the creditors as efficiently and quickly as possible. She testified that the Trustee acted well within the scope of his fiduciary duties in this case. Ms. Tavenner stated that the Trustee acted with diligence and candor, and that he went "above and beyond" his duties in terms of patience and caution in proceeding with the sale of any assets.

96.     In filing the claims, Ms. Tavenner testified that the Trustee did not simply rely on the Schedules; rather, he communicated with the creditors. Further, he sought the advice of the U.S. Trustee and that of the other panel Trustees before he filed the claims.

97.     Ms. Tavenner testified that the Trustee began to liquidate the available assets in a manner that would have visited the least amount of harm on the non-debtor co-owner, Mr. Skubal. In her view, the Trustee never moved to sell the Florida residence and never attempted to

sell the day care business. He moved to sell the unimproved lot first, which would have had the least impact on Mr. Skubal.

98.     Ms. Tavenner considered the contents of the U.S. Trustee's Manual for Trustees, which states in part:

> While Section 501(c) and Fed. R. Bankr. P. 3004 give the trustee the ability to file proofs of claim on behalf of creditors, the trustee should exercise caution in doing so. In contacting creditors or filing claims, the trustee should exercise caution to treat similarly situated claims equally.

TR Ex. 49.

99.     Ms. Tavenner viewed the reference above to treating similarly situated claims equally to mean that the Trustee should not distinguish between non-dischargeable general unsecured claims (like student loans) and other unsecured claims (like credit card debts).

100.    When asked "what if a loan was current," such as the Debtor's student loan in this case, she stated that this should have no bearing on a Trustee's decision on whether or not to file a claim.

101.    Ms. Tavenner testified that the Debtor received a "huge" benefit in this case, the payment in full of her presumptively non-dischargeable student loans. Ms. Tavenner also noted that the Debtor received a discharge of her debts in this case.

102.    She further testified that Mr. Skubal received certain benefits, such as the entry of the Consent Order, requiring that the unimproved lot be sold before the vacation home. She testified that Mr. Skubal further benefitted greatly by purchasing the lot for $46,000.00, which, in her view, was "a very good deal."

21

103.    Ms. Tavenner acknowledged on cross-examination that, although she solicits creditors to file claims, she has never filed a student loan claim as a Trustee in one of her cases.

104.    Overall, the Court found Ms. Tavenner to be a highly credible witness, and her testimony was helpful to the Court.

*N.  Mr. Skubal's Testimony.*

105.    Mr. Skubal, the Debtor's father, testified. Although he was proffered as an expert in real estate valuation, the Court found that he was not qualified to testify as an expert witness. This notwithstanding, he was permitted to testify as to the value of Lot 102 as its owner.

106.    Mr. Skubal testified that Lot 102 (1.89 ac.) is located near the entrance of the Firethorn Subdivision, which is near Blowing Rock (near Boone), North Carolina.

107.    The lot is surrounded by streams and it occupies ground that is higher than the neighboring lots.

108.     Mr. Skubal testified that he purchased Lot 102 in 2012 or 2013, for $200,000.00. In fact, the Deed was recorded on August 31, 2007. TR Ex. 20 (Deed, Ex. A). After purchasing the lot, he improved it by clearing the land.

109.    Ms. Skubal did not contribute to the purchase price of the property and she has not paid for any of the costs of the improvements, nor the real estate taxes, since Mr. Skubal's acquisition of the lot. Mr. Skubal put her on the title to this and his other properties for estate planning reasons.

110.    Mr. Skubal testified that the value of Lot 102 at the time that he purchased it from the Trustee was "well over $100,000.00, close to $200,000.00."

22

111.    Mr. Skubal acknowledged that under the Consent Order the Trustee had the right
to select the broker for the property. He also acknowledged that he did not like Pat Taylor, owing
to a dispute that he had with Ms. Taylor on another property.

112.    Mr. Skubal initially was comfortable with using Maurice Williams to list the lot
(Mr. Skubal had already listed the lot with Mr. Williams), but he became enraged when he heard
that there was a price reduction for the listing and threatened to sue Mr. Williams.

113.    Lot 102 was on the market for almost two years. The MLS listing was first posted
on April 27, 2015. Skubal Ex. J. The property was sold to Mr. Skubal in February 2017. *Id.*

114.    Mr. Skubal paid $46,000.00 for the purchase of Lot 102.

115.    Although Mr. Skubal testified that the Trustee "threatened" him with the sale of
all of his properties, including the Florida condo and the day care business, the Court saw no
evidence that the Trustee ever seriously moved to sell these properties. Rather, the Trustee
focused on Lot 102 first because it was unencumbered and because the sale of Lot 102 would
have resulted in the least disruption to Mr. Skubal as a co-owner.

*O.  Ms. Skubal's Testimony.*

116.    Ms. Skubal testified that the lawsuit from SunTrust for the line of credit on one of
her father's properties, which she had personally guaranteed, caused her to file for bankruptcy
protection. In her words, her father "got me into this mess."

117.    Ms. Skubal testified that when she filed for bankruptcy her student loans were
current. She stated that she was never late in making the payments (which totaled approximately
$300 to $325 per month), and that paying the loans was not burdensome to her.

23

118.    She further testified that when her father paid off her student loans she agreed to repay him in the same monthly amounts as she was paying ACS. Importantly, however, there was no evidence that she ever communicated this arrangement to the Trustee and there was no evidence that the Trustee was aware of this arrangement.

119.    Ms. Skubal understood that the student loan claims were non-dischargeable when she filed for bankruptcy.

120.    Ms. Skubal listed the Citi credit card claim and the ACS student loan claims as being undisputed and not unliquidated in her Schedules. TR Ex. 2, p. 15. She acknowledged in her testimony that the Citi claim was a "legitimate" claim.

121.    She understood when she filed for bankruptcy that the Trustee might seek to liquidate one or more of the properties to pay the creditors in her case. She discussed this with her father before she filed her bankruptcy petition. She and father discussed alternatives to bankruptcy, including her father selling one of his properties to pay off SunTrust, but her father declined to consider a sale of any of his properties because he viewed the market as being depressed at the time.

122.    Ms. Skubal testified that it was "only common sense" that she received a benefit from the payment of her student loans. On the other hand, she stated that there was the "potential for a profit" from the sale of her and her father's properties in the future, although she also conceded that such profit was "speculative."

123.    Ms. Skubal did not see anything wrong or unfair with the Order Approving Compromise for the sale of Lot 102 and 226 Old Meg's Lane.

24

**Conclusions of Law**

This Court has jurisdiction over this matter pursuant to 11 U.S.C. § 1334 and the Order of

Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core

proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the

estate) and (B) (allowance or disallowance of claims against the estate).

Sections 704(a)(1) and (a)(5) of the Bankruptcy Code set forth the Trustee's duties in part

as follows:

> (1)  collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

\*        \*        \*

> (5)  if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper[.]

11 U.S.C. §§ 704(a)(1), (5).

Section 501(c) of the Code provides: "If a creditor does not timely file a proof of such

creditor's claim, the debtor or the trustee may file a proof of such claim." 11 U.S.C. § 501(c).

Bankruptcy Rule 3004 implements Section 501(c) by providing:

> If a creditor does not timely file a proof of claim under Rule 3002(c) or 3003(c), the debtor or trustee may file a proof of the claim within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c), whichever is applicable. The clerk shall forthwith give notice of the filing to the creditor, the debtor and the trustee.

Fed. Rule Bank. Pro. 3004.

A debtor's ability to file a proof of claim on behalf of creditors can be particularly

important in the context of consumer bankruptcy cases. In most Chapter 13 cases, the purpose of

the case is to save the debtor's home by paying accrued mortgage arrearages over the life of a

Chapter 13 plan. If the mortgagee does not file a timely proof of claim, the Chapter 13 Trustee

cannot pay the arrearages. It is, therefore, important for the debtor to avail herself of the

opportunity to file a claim on behalf of the mortgagee so that the arrearages can be paid under the

plan. In Chapter 7, debtors usually will want to file claims on behalf of non-dischargeable

obligations such as taxes, so that any assets of the estate are directed toward the payment of

obligations that will survive the debtor's bankruptcy.

A number of courts have imposed a "benefit to the debtor" requirement for trustees to file

proofs of claim. *See, e.g.*, *In re Nettles*, 251 B.R. 899 (Bankr. M.D. Fla. 2000) ("[I]t is clear that

[the Trustee] filed the claims in order to maximize his fee, not to protect the debtor. As such, [the

Trustee's] claims must be disallowed because their purpose is inconsistent with the objectives of

§ 501(c)"); *In re Mustelier*, 65 B.R. 59 (Bankr. S.D. Fla. 1986) (denying trustee's motion for

leave to file a dischargeable claim on behalf of creditor).

Other cases have rejected the benefit to the debtor requirement as being inconsistent with

the plain language of Section 501(c) and Bankruptcy Rule 3004. *See Yoon v. VanCleef,* 498 B.R.

864 (N.D. Ind. 2013) ("The provisions at issue contain no qualifications as to why or to what end

the trustee may file such claims. These provisions are clear and unambiguous, and expressly

permit the trustee file these claims"); *In re Schmidt*, 333 B.R. 868, 870 (Bankr. N.D. Fla. 2005)

("While the Trustee may not have an affirmative duty to file such proofs of claims, he likewise

26

has no duty to refrain from doing so in order that the Debtor receive a windfall while receiving a

discharge in bankruptcy.")

The Court, however, is not called upon to decide which line of cases is the better

reasoned. In this case, the Court is required, on remand from the District Court, to review

"whether the benefit to be derived from the Trustee's decision to file and pursue claims on behalf

of creditors who did not file claims was outweighed by the harm imposed on the parties in

interest, including the debtor and Mr. Skubal." Docket No. 124, District Court Order, p. 13. The

Court, therefore, will review the Trustee's actions not just in filing, but in defending, the two

proofs of claim at issue.

   A.  *The Citi/Midland Claim.*

The Midland claim was a dischargeable credit card claim, assigned to Midland from Citi.

There was no apparent benefit to Ms. Skubal in filing the claim.

More importantly, whether or not Section 501(c) and Bankruptcy Rule 3004 require a

"benefit to the debtor" in filing claims, the Trustee improperly took on the role of *defending* the

Midland claim. Mr. Skubal raised the issue of the statute of limitations in an Amended Objection

to the claim. The Trustee testified in this proceeding that he assumed that Midland had a written

contract, which would have meant that the claim was not time-barred under State law. However,

the Trustee should have recognized that Midland, as an assignee of Citi, might not have had in its

possession a copy of a signed credit agreement, or might not have had sufficient access to Citi's

files to locate a signed credit agreement. In all events, it was clear that Midland had no intention

of hiring local counsel and sending a corporate representative to Alexandria, Virginia, to defend

27

its claim. Once Mr. Skubal raised a legitimate State-law based objection to the claim (that is,

something other than the assertion that the Trustee should not have filed the claim in the first

place), the Trustee's duty to the creditors, and to the Debtor in this case because the estate was

solvent, was to step aside, and to allow Midland to defend its claim on the merits.

By the Trustee's calculation, his law firm charged $10,060.00 in legal fees to defend the

Midland claim. TR Ex. 51, p. 7. The Trustee testified that he wrote off $23,000.00 in fees before

he submitted his Final Application for Compensation to the Court, but there is no way to

determine that any or all of that amount represents the same time entries for the defense of the

claim (and in any event, once the time is written off, it cannot be used defensively as though it

were allowed by the Court as an administrative expense of the estate). The Court will disallow

this amount as having been improperly charged to the estate.

B.  *The ACS Student Loan Claim.*

The benefit to the Debtor of having her three student loans paid in full is obvious: she

exited bankruptcy without the presumptively non-dischargeable student debts hanging over her

head. The Debtor argues that she was current on her payments with the student loan lender, but

this does not obviate the benefit of coming out of bankruptcy debt-free. Ms. Skubal

acknowledged this in her testimony. She also testified that she had an agreement to repay her

father on the same monthly payment terms that she had with ACS (approximately $300 to $325

per month), but there was no evidence that she ever made the Trustee aware of this arrangement.

Unlike the Midland claim, there was no statute of limitations defense available on the ACS

claim.

28

The benefit to Mr. Skubal was equally clear – he avoided the sale of the vacation home by paying off the student loans. Further, he was able to purchase Lot 102, a property that he valued in his testimony before this Court at "well over $100,000," and perhaps as much as $200,000, for just $46,000.

Moreover, Mr. Skubal was guilty of inordinate delay in paying off the student loans, during which the Trustee incurred legal fees to bring the adversary proceeding under Section 363(h) and to negotiate the Consent Order on the sale of the properties. During this period of time, Mr. Skubal engaged in highly questionable behavior. He first threatened to pay off the student loans in April 2015. TR. Ex. 27, p. 2. He delayed paying the student loans off for eighteen months until November 2016. TR Ex. 43. In the meantime, he threatened the Trustee's real estate agent with a lawsuit. TR Ex. 38. He hired an agent for the sale of 226 Old Meg's Lane, which was completely inconsistent with the terms of the Consent Order. TR Exs. 31, 32. He and the Debtor actually encumbered 226 Old Meg's Lane with a Deed of Trust in the amount of $311,102.02 while the case was still pending, without the Trustee's knowledge or the Court's approval. TR Ex. 36.

It is not accurate to accuse the Trustee of incurring tens of thousands of dollars in legal fees, while paying just hundreds of dollars in claims. Had Mr. Skubal not paid off his daughter's student loans (for which he *did* perceive a benefit – TR. Ex. 22), the Trustee would have paid over $43,000.00 in non-dischargeable student loans. Three things are clear from the evidentiary hearing: first, Mr. Skubal never would have paid the student loan claim had the Trustee not forced the issue in moving to sell Lot 102; second, Mr. Skubal acted as a volunteer in paying off

29

the student loans in an effort to avert the sale of his properties; and third, Ms. Skubal undeniably benefitted from the payment in full of her non-dischargeable student loans.

The Trustee's legal fees – totaling $34,500.00 (after a voluntary reduction in the amount of $23,000.00), reduced by the Court, above, in the amount of $10,060 for a net legal fee award of $24,440.00, is comparable to the benefit achieved in this case. Even adding the Trustee's statutory commission of $5,350.00 to the legal fees (as reduced, above) yields a total of $29,790.00, again, comparable to the benefit achieved – the payment of the student loans totaling $43,000.00. The benefit need not be dollar for dollar, nor are the Trustee's fees limited to some artificial percentage of what was paid out to the creditors. The Court is satisfied that the payment of the Debtor's non-dischargeable student loans justifies the legal fees and the Trustee's statutory commission in this case.

The Court will order the Trustee to file an Amended Final Report, deleting the $10,060.00 in legal fees for the defense of the Midland claim and adjusting his statutory commission.[6]

---

[6]  The Trustee's Amended Final Report will have to reduce his statutory commission for the $10,060.00 to be disbursed to Ms. Skubal. *See* 11 U.S.C. § 326 (trustee entitled to a commission on all amounts disbursed to parties in interest "excluding the debtor").

### Conclusion

It is therefore **ORDERED**:

1.        The Debtor's and Mr. Skubal's Objections to the Trustee's Final Report will be sustained in part and overruled in part. The Court disallows the $10,060.00 in legal fees associated with the Trustee's defense of the Midland claim. The Court allows the balance of the Trustee's legal fees and the Trustee's statutory commission except as stated below.

2.        The Trustee will file an Amended Final Report showing the disallowance of the fees related to the defense of the Midland claim, and the adjusted commission, which Amended Final Report will propose to disburse the same amount to the Debtor, and will notice the same for a hearing.

3.        The Clerk will mail copies of this Opinion and Order or will provide cm-ecf notice of its entry, to the parties below.


Date: __Dec 14 2018_____          /s/ Brian F. Kenney
                                        _____
                                        Brian F. Kenney
Alexandria, Virginia                    United States Bankruptcy Judge

                                         Entered on Docket:  12/14/2018

Copies to:

Megan Skubal
6009 Forest Rd.
Hyattsville, MD 20785
*Debtor*

Thomas Skubal
5701 Camino Del Sol, No. 306
Boca Raton, FL 33433
*Party in Interest*

Richard G. Hall, Esquire
7369 McWhorter Place
Suite 412
Annandale, VA 22003
*Counsel for Debtor*

Kevin R. McCarthy, Esquire
8508 Rehoboth Ct.
Vienna, VA 22182
*Chapter 7 Trustee*

Bradford F. Englander, Esquire
Suite 800
3190 Fairview Park Drive
Falls Church, VA 22042
*Counsel for Chapter 7 Trustee*